#24449-a-JKM
**2008 SD 36**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

NORTH STAR MUTUAL INSURANCE
COMPANY,                                               Plaintiff and Appellee,
     v.
BRAD PETERSON, LENNY
PETERSON, and DANNY PETERSON,
d/b/a PETERSON FARMS; JEB
PETERSON, MITCHELL PETERSON,          Defendants and Appellees,
     and
MILBANK INSURANCE COMPANY,              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE JON R. ERICKSON
Judge

* * * *

MICHAEL J. SCHAFFER of
Schaffer Law Office, Prof., LLC          Attorneys for appellee
Sioux Falls, South Dakota                North Star.

RODNEY FREEMAN, JR. of
Churchill, Manolis, Freeman,
 Kludt, Shelton & Burns                   Attorneys for appellees
Huron, South Dakota                      Peterson.

ROBERT B. ANDERSON of
May, Adam, Gerdes & Thompson, LLP        Attorneys for defendant
Pierre, South Dakota                     and appellant.

* * * *

ARGUED ON OCTOBER 2, 2007

OPINION FILED **05/07/08**

#24449

MEIERHENRY, Justice

[¶1.] This case involves a question of automobile insurance coverage for injuries sustained when a gun discharged while deer hunters were waiting to be transported to the fields. The circuit court found that the automobile liability policy covered the gunshot injuries.

[¶2.] Milbank Insurance Co. (Milbank) issued the automobile liability policy in question to Peterson Farms. Brad, Lenny and Danny Peterson were general partners in Peterson Farms.[1] In addition to the Milbank automobile liability policy, Peterson Farms had an umbrella liability policy from North Star Mutual Ins. Co. (North Star). The circuit court found coverage under Milbank's personal automobile liability policy. Milbank appeals. The court found no coverage under North Star's umbrella policy because of exclusions specified in the policy.[2] The ruling as to North Star's coverage has not been appealed.

[¶3.] In a trial to the court, the parties stipulated to most of the relevant facts. The day before the accident, Brad Peterson had been deer hunting with his sons Jeb and Shane. Eleven-year-old Jeb was using his father's Winchester Model 94, .30-.30 lever action rifle to hunt varmints such as coyote or fox. While the

---

1. Brad, Lenny and Danny Peterson were partners in the Peterson Farms Partnership. Brad Peterson and his immediate family and Lenny Peterson and his immediate family lived in separate households approximately 1.5 miles from each other.

2. The circuit court found that the North Star policy provided no coverage for the injuries because it contained language that excluded coverage for bodily injuries resulting from the ownership, operation, maintenance, use, and loading or unloading of a vehicle. Peterson Farms did not appeal the circuit court's ruling.

#24449

hunting party was loading the rifles into the pickup at the conclusion of the hunt, a friend drove up and assisted young Jeb with loading the rifle into the vehicle. The friend ejected the round out of the chamber and opened the lever. The open lever made the rifle safe from discharge; however, its magazine still held ammunition. The friend placed the rifle into the back seat of the Peterson's vehicle. He propped it near the middle of the backseat of the pickup with the barrel end on the floor and the butt leaning against the back of the seat. The hunting party then returned to Brad's home driving through fields and over country roads. The rifle remained in the vehicle.

[¶4.] The next morning, Brad, Shane and Lenny's fourteen-year-old son, Mitch again went deer hunting. While hunting, they walked through a slough and got their clothing wet. They removed and threw the wet hunting clothes in the pickup's backseat on top of the rifle. The hunting party then returned to Brad's home. Later that afternoon, Brad, Shane, Mitch and Jeb prepared to go hunting again. They got into the pickup: Brad and Shane in the front seat, Mitch and Jeb in the backseat. The rifle was still in the backseat situated between Jeb and Mitch. Jeb noticed that the wet hunting clothes were lying on the rifle and that the barrel had moved sideways and was unsafely pointed at Mitch's leg. Jeb grasped the rifle in an attempt to reposition it away from Mitch's leg. As he moved the rifle, it discharged and struck Mitch's left ankle and grazed his right ankle.

[¶5.] The pickup engine was on and idling but the pickup was not moving at the time of the accident. The hunting party assumed that the vehicle's movement over the two days had jostled the rifle causing the lever to close and that their wet

hunting clothing on top of the gun had caught and pulled the trigger. There was no evidence that anyone had handled the gun since its placement in the pickup the day before.

[¶6.]    Milbank brought a declaratory judgment action asking the circuit court to determine whether its automobile liability policy with Peterson Farms covered Mitch's bodily injuries arising from this hunting accident. The dispute centers on the language in Milbank's insurance policy defining coverage. The terms of the policy provide that "[Milbank] will pay damages for 'bodily injuries' or 'property damage' for which any insured becomes legally responsible because of an auto accident . . . ." The policy further defines an "insured" as "you or any family member for the ownership, maintenance or use of any automobile or trailer."

[¶7.]    The circuit court determined that Milbank was liable under the terms of the insurance policy. The court reached that conclusion by finding ambiguity in the term "auto accident," in part because it was undefined in the policy. The court then applied the rules of construction for insurance contracts and interpreted the ambiguous term in the insured's favor. Milbank argues that the circuit court erroneously found that the term, "auto accident," was ambiguous solely because it was undefined in the policy. Milbank claims that the plain meaning of the policy's term "auto accident" does not cover the accidental shooting. Milbank raises the following issue on appeal:

### ISSUE

Whether the circuit court erred in holding that the shooting incident of November 24, 2001, was the result of an "auto accident" as that term is used in the Milbank insurance policy.

[¶8.] Our standard of review is de novo. We review a declaratory judgment under SDCL 21-24-13 "as we would any other judgment or order." *Gloe v. Union Ins. Co.*, 2005 SD 30, ¶7, 694 NW2d 252, 256. "When interpreting insurance contracts, we have uniformly held them reviewable as a matter of law under the de novo standard." *Opperman v. Heritage Mut. Ins. Co.*, 1997 SD 85, ¶3, 566 NW2d 487, 489 (citing *De Smet Ins. Co. v. Gibson*, 1996 SD 102, ¶5, 552 NW2d 98, 99) (other citations omitted).

[¶9.] The circuit court determined that since the Milbank policy did not define the term "auto accident," the term was ambiguous and construed the term broadly in favor of the insured to find coverage. Milbank argues that the absence of a definition in the policy does not render the term ambiguous, and that the plain meaning of the term excludes coverage. Generally, we agree that the mere absence of a definition does not alone create ambiguity.

[¶10.] Ambiguity is created when the language in an insurance contract "is fairly susceptible to two constructions." *Nat'l Sun Indus., Inc. v. South Dakota Farm Bureau Ins. Co.*, 1999 SD 63, ¶18, 596 NW2d 45, 48 (citing *Econ. Aero Club v. Avemco Ins. Co.*, 540 NW2d 644, 645 (SD 1995) (citations omitted)). Ambiguity is "determined with reference to the policy as a whole and the plain meaning and effect of its words." *Id.* By the terms of the policy, Milbank agreed to "pay damages for 'bodily injuries' or 'property damage' for which any insured becomes legally responsible because of an auto accident . . . ." Although the parties disagree on the meaning of the terms, their meaning can be determined without resorting to an ambiguity analysis.

[¶11.] Milbank argues that the accidental discharge of the firearm in the backseat of the vehicle cannot be considered an "auto accident" as that term is defined under any common sense analysis. Milbank views the situation as one where an accident took place in an automobile and did not constitute an automobile accident. Milbank claims that the auto was merely the site of the occurrence and that there was no causal connection between the vehicle's use and the injury-producing event.

[¶12.] Nevertheless, Milbank does not dispute that the policy covers accidents arising out of the "ownership, maintenance and use" of the vehicle. Milbank conceded during oral arguments that the statutory language covering "damages arising out of the ownership, maintenance, or use of the vehicle," must be considered when interpreting the insurance policy and that the language was, in effect, part of the policy. SDCL 32-35-70. Additionally, the policy uses these terms in its definition of insured. The Milbank policy defines "insured" as "you or any family member for the ownership, maintenance or use" of a vehicle. The policy also provides that "[w]hen this policy is certified as future proof of financial responsibility, this policy shall comply with the law to the extent required." South Dakota law of financial responsibility requires insurance "against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of the vehicle or vehicles . . . ." SDCL 32-35-70. Thus, a fair interpretation of the term "auto accident" would be an accident arising out of the "ownership, maintenance and use" of the automobile.

[¶13.]	In *Lyndoe v. American Standard Ins. Co.*, we analyzed insurance coverage of an accidental shooting in an automobile. 90 SD 644, 245 NW2d 273 (1976). In that case, Loren Lyndoe was riding through downtown Custer in a truck driven by his brother, James. Lyndoes pulled their vehicle over to the side of the road to talk to an acquaintance in another vehicle. *Id.* at 645, 245 NW2d at 273-74. While the vehicles were parked side by side, the acquaintance attempted to hand a .38 caliber pistol through his driver's side window to Loren. Loren reached for the gun through his window. Before Loren touched the gun, it discharged and struck Loren in the mouth.

[¶14.]	The policy language in *Lyndoe* provided as follows:

> The company shall pay on behalf of the insured all sums which
> the insured shall become legally obligated to pay as damages
> because of:
> Coverage A – bodily injury caused by accident and arising out of
> the ownership, maintenance or use of the automobile.
> '(U)se' of the automobile includes loading and unloading.

*Id.* at 647, 245 NW2d at 275.

[¶15.]	Although much of the analysis in *Lyndoe* centered on whether passing the gun into the window constituted "loading or unloading" the vehicle, the basic question was whether the accident arose out of the "use" of the vehicle. *Id.* We said, "[s]ome causal connection between the 'use' of the vehicle . . . and the accident must exist." *Id.* (citations omitted). We also adopted a broad view of the 'use' clause in automobile coverage policies. *Id.* at 650, 245 NW2d at 276. We noted as follows:

> Some of the cases [from other jurisdictions] involved efforts by a
> plaintiff to include his injuries within an automobile policy
> providing coverage under a 'use' clause, while others involved an
> effort by an insurer to exclude injuries from a homeowner's
> policy because of a clause excluding automobile 'use.' In the

latter policy the 'use' clause is given a narrow interpretation, while in the former, courts have adopted a broader interpretation. ***Therefore the broader view of the 'use' clause must be adopted in this case.***

*Id.* at 649-50, 245 NW2d at 276 (emphasis added).

[¶16.]     Even under the broader view, we determined that the vehicle in *Lyndoe* was the mere situs of the accident and the injury did not arise from the 'use' of the vehicle. *Id.* We analyzed it as follows:

> Here the parties were within the City of Custer and not on a hunting expedition. They were merely discussing past and possible future hunting. The pistol was not to be delivered for the purpose of hunting nor for any use other than an examination by plaintiff followed by a return to Stender. It has been held that under a "loading and unloading" clause, the efficient and predominating cause of the accident must arise from the "use" of the vehicle. (citations omitted). Stender's actions were a continuation of the conversation between the parties and could well have taken place elsewhere except for the temporary storage of the pistol in the vehicle. His independent act of reaching out the window of the vehicle was the event which discharged the pistol. Only his hand and arm extended outside the vehicle. Plaintiff admitted that he could have reached the pistol from his vehicle which was approximately two feet away. The vehicle was merely the [s]itus from which Stender reached in attempting to deliver the pistol to plaintiff. We find this case more analogous to those cases where a gun was passed or moved within a vehicle than to those cases where a person stepped from his vehicle and attempted to remove a gun. We conclude that the policy's provisions cannot be interpreted so broadly as to allow coverage here.

*Id.*

[¶17.]     Milbank argues that *Lyndoe* supports its analysis and the absence of coverage because *Lyndoe* distinguishes between cases where firearms discharge while loading and unloading them from vehicles and cases where firearms discharge while being handled inside the automobile. Generally, cases from other

jurisdictions that concern coverage of hunting accidents fall into categories. The

Supreme Court of New Mexico lists the categories as follows:

> 1) accidents in which the actual movement of the vehicle caused the firing of the gun, as in transport; 2) accidents in which the discharged gun was being removed from or placed in a gun rack in the vehicle; 3) accidents in which the gun was being loaded into or unloaded from the vehicle; 4) accidents arising from use of the vehicle as a gun rest; and 5) accidents in which the vehicle is described as a "mere situs" for the accident, such as when children play with guns in a standing vehicle.

Sanchez v. Herrera, 783 P2d 465, 467 (NM 1989) (citation omitted). *See also*

Cameron Mut. Ins. Co. v. Ward, 599 SW2d 13, 15-16 (MoCtApp 1980) (the court

analyzed and categorized cases from several jurisdictions).

[¶18.]       Milbank urges us to adopt the nexus test set forth by the South

Carolina Supreme Court in *Peagler v. USAA Ins. Co.*, 628 SE2d 475 (SC 2006). The

*Peagler* court used a three-part test previously adopted in *State Farm Fire & Cas.*

*Co. v. Aytes*, 503 SE2d 744 (SC 1998) to determine whether an injury arose from the

"ownership, maintenance, or use" of a vehicle. *Peagler,* 628 SE2d at 477. The court

explained the test as follows: "The party seeking coverage must show (1) a causal

connection exists between the vehicle and the injury, (2) no act of independent

significance breaks the causal link between the vehicle and the injury, and (3) the

vehicle was being used for transportation purposes at the time of the injury." *Id.* at

478 (citing *Aytes*, 503 SE2d at 745). The *Peagler* court specifically rejected

precedent of other courts that find coverage when accidents occur during the

loading and unloading of a vehicle. 628 SE2d at 480. The court narrowly limited

coverage to instances where the plaintiff could demonstrate that the vehicle "was an

active accessory to the injury." *Id.* at 481.

[¶19.] The three-part test followed in *Peagler* is unique to South Carolina law dating back to 1975. *See* Home Ins. Co. v. Towe, 441 SE2d 825, 827 (SC 1994); *see also* Chapman v. Allstate Ins. Co., 211 SE2d 876 (SC 1975). Most jurisdictions do not use such a restrictive test. We find this restrictive and narrow approach not in sync with *Lyndoe,* where we clearly adopted a broad view when applying a "use" clause in an automobile liability policy. Nevertheless, even with a broad interpretation, a plaintiff still has to show some causal connection between the injury and the vehicle.

[¶20.] Other courts have recognized a causal connection and found coverage when a gun discharges in a vehicle in conjunction with a hunting expedition. We referred to this causal connection by implication in *Lyndoe*. Our language in *Lyndoe* implied that if the parties had been on a hunting expedition, our analysis would have been different. We said:

> Here the parties were within the City of Custer and **not on a hunting expedition**. They were merely discussing past and possible future hunting. The pistol was not to be delivered **for the purpose of hunting** nor for any use other than an examination by plaintiff followed by a return to Stender.

*Lyndoe,* 90 SD at 650, 245 NW2d at 276 (emphasis added).

[¶21.] Mitch Peterson's injury undisputedly occurred during the "use" of the vehicle on a hunting trip. Whether the vehicle was more than "mere situs," however, requires additional analysis. For purposes of coverage under the policy, there must be a causal connection between the accident that injured Mitch Peterson and the use of the pickup truck. Other jurisdictions have required "for coverage to apply, '[t]he injury must also have a causal connection to the inherent use of the

vehicle.'" Kemp v Feltz, 497 NW2d 751, 755 (WisCtApp 1993) (holding that use of a truck as a "mobile hunting vehicle is consistent with the truck's inherent use" for transportation of hunters); s*ee, e.g.*, *Sanchez*, 783 P2d at 467 (concluding "that emptying a gun within the cab of a pickup truck is foreseeably incident to use of that vehicle for hunting"); Allstate Ins. Co. v. Powers, 949 P2d 521, 524 (ArizCtApp 1998); Taliaferro v Progressive Specialty Ins. Co., 821 So2d 976, 978 (Ala 2001). We find this causal connection analysis more persuasive than the narrow three-part test used in *Peagler*. 628 SE2d 475.

[¶22.] The Kansas Supreme Court, in a strikingly similar hunting accident case, applied a causal connection analysis to find coverage. Garrison v. State Farm Mut. Auto. Ins. Co., 907 P2d 891 (Kan 1995). In *Garrison,* two men were hunting doves. They stopped the car for one of the hunters to get out. A gun stowed between the front seats of the vehicle discharged while one of the men was getting out of the car. No one knew why the gun discharged. The discharge struck the other passenger in the leg causing serious injury. *Id.* at 893. The terms of the liability policy were similar to Milbank's policy. The policy covered damages "which an *insured* becomes legally liable to pay because of . . . *bodily injury* to others . . . caused by accident resulting from the ownership, maintenance or use of *your car."* *Id.* The policy also "promise[d] to pay damages for bodily injury . . . for which the law holds *you* responsible because of a *car accident* . . . ."[3] *Id.* at 894. The court explained the causal connection as follows:

---

3.    The policy defined "car accident" as "an unexpected and unintended event that causes injury or property damage and arises out of the ownership

(continued . . .)

> [F]or insurance coverage to exist for accidental bodily injury,
> there is no requirement that the vehicle be either the proximate
> cause of the injury or physically contribute to the discharge of
> the gun. Coverage exists where the minimal causal connection
> between the use of the vehicle and injury is provided by the
> foreseeable and reasonable use of the vehicle for hunting.

*Id.* at 895.

[¶23.] The court found that the car was more than the mere situs of the injury, and endorsed the statement that "Kansas follows the majority rule that there must be some causal connection between the use of the insured vehicle and the injury." *Id.* at 895 (citation omitted). The court held that "under the facts of this case, the injury sustained by Garrison, the driver, when a shotgun inside the car accidentally discharged as it was removed from the car, was a natural and reasonable incident arising out of the use of the car for hunting." *Id.* at 896.

[¶24.] Other courts have used a similar inquiry. *See* Thompson v. State Farm Mut. Auto. Ins. Co., 468 NW2d 432, 435 (Wisc 1991). The Wisconsin Supreme Court found automobile liability insurance coverage for a hunting accident because using a truck "for a hunting trip is reasonably consistent with the inherent use of the truck." *Id.* In *Allstate Ins. Co. v. Truck Ins. Exchange,* the Wisconsin Supreme Court considered whether an accidental shooting on a hunting trip in a van was covered by the "use" provision in the insured's automobile liability policy. 216 NW2d 205 (Wis 1974). In that case, the passenger accidentally shot the driver while unloading the rifle from the vehicle for the purposes of shooting an elk. The

_____

(. . . continued)
maintenance, or use of a *car* or other *motor vehicle." Garrison,* 907 P2d at 894. "The policy provisions did not expressly define 'use' to include loading or unloading of a vehicle." *Id.* at 894.

-11-

Wisconsin Supreme Court held that the use of a van for carrying hunters and guns when the van was outfitted for hunting "was reasonable and could be expected." *Id.* at 210. The court found coverage "[i]f it can reasonably be expected that this van would be used to go on such a hunting outing, the necessary incidentals for such a hunting trip will be transported in the van, i.e., rifles, ammunition, equipment and supplies." *Id.* The court used the following test to determine whether the "use" of the vehicle was the cause of the bodily injuries:

> In determining whether the negligent act that caused bodily injury arose out of the 'use' of a motor vehicle within the coverage of a motor vehicle liability policy, the court must consider whether it was a natural and reasonable incident or consequence of the use of the vehicle for the purposes shown by the declarations, though not foreseen or expected. Thus, it has been held that one who entered an automobile in order to move it a short distance so as to enable him to park his own automobile was 'using' such when, because of defective brakes, the car rolled into a third car and caused injuries thereto. However, it has been held that an injury need not be the direct and proximate result, in a strict legal sense, of the use of an automobile to come within coverage of a policy indemnifying against liability for damages caused by accident and arising out of the ownership, maintenance or use of the automobile. This principle has been applied in cases where the injuries for which recovery was sought did not result from the movement of the vehicle.

*Id.* at 211 (citation omitted). The court concluded that this accidental shooting fell within the "use" provision of the automobile liability policy. *Id.* The gun's accidental discharge was a natural and reasonable consequence of transporting guns on a hunting trip. *Id.* The New Mexico Supreme Court posed the inquiry as follows: "the proper inquiry in hunting accidents involving automobiles is whether the use made of the vehicle at the time of the accident logically flows from and is consistent with the foreseeable uses of that vehicle." *Sanchez*, 783 P2d at 467.

-12-

[¶25.]    In the circuit court's memorandum decision it stated: "Having reviewed [the pertinent cases] it is my conclusion that there is coverage for this type of accident under the Milbank policy because it clearly happened on a hunting expedition." Furthermore, the circuit court concluded: "that the vehicle was not the mere situs of the accident, but that the loading of the rifle into the vehicle, its location in the vehicle and its movement were part of the use of the vehicle in the hunting expedition." We agree with the circuit court's logical conclusion that the vehicle was being used in a hunting expedition. The parties stipulated facts provided that at the time of the shooting "[t]he four occupants were all seated in the pickup. They were waiting for Trent Peterson to enter the pickup *so they could leave to go hunting*." (Emphasis added). The stipulated facts also indicated that the afternoon hunt was a continuation of the morning hunting expedition. Temporarily stopping the vehicle for a brief snack break did not eliminate the purpose for which the gun was loaded and present in the vehicle. At the time of the accident, the hunters were preparing to continue the hunting expedition: the hunters had entered the vehicle, the guns were still in the vehicle, the vehicle was running and the party intended to continue the morning hunt as soon as the final passenger got into the pickup.

[¶26.]    Clearly, an inherent use of a pickup truck is for transportation, which may involve driving through fields and over country roads. Here, the vehicle was being used to transport deer hunters to the field along with their equipment, clothing and guns. Transporting hunters and guns is a foreseeable and inherent use of a pickup truck in this State. Thus, it logically follows that when a pickup is

being used in a hunting expedition where guns are being transported, the accidental discharge of the firearm can be said to be causally connected to the vehicle's use. The vehicle need not be the cause of the discharge only that its use is causally connected.

[¶27.]     The circuit court found that the Milbank policy covered the hunting accident because the accident occurred in connection with the use of a vehicle in conjunction with a hunting expedition, and because the vehicle was more than the mere situs of the accident.[4]  Based on the undisputed facts and the language of the policy, we affirm.

[¶28.]     GILBERTSON, Chief Justice, and SABERS, Justice, concur.

[¶29.]     KONENKAMP and ZINTER, Justices, dissent.


ZINTER, Justice (dissenting).

[¶30.]     Was this shooting an "auto accident"?  I agree that the "use" of a pickup for hunting is foreseeable, and that the transportation of firearms may be incident to use of a vehicle if the vehicle is actually being used on a hunting expedition.  Under the undisputed and stipulated facts, however, this case involved

---

4.     The circuit court also found that the vehicle was the "efficient and predominating cause" of the accident.  In *Cain v. Fortis Ins. Co.*, we held this doctrine did not apply to health insurance policies.  2005 SD 39, 694 NW2d 709.  We stated, "[t]he doctrine of efficient proximate cause has been utilized in cases involving property and casualty insurance policies."  *Id.* ¶25, 694 NW2d at 714.  It is applied "where two separate or distinct perils could have occurred independently of the other and caused damage."  *Id.*  In dicta in *Lyndoe* we cited to this standard.  245 NW2d at 276.  We decline to discuss whether the "efficient and predominating cause" doctrine applies in this context because it is not properly before the Court.

the accidental discharge of a firearm that was merely being repositioned in a pickup that was still parked in the insured's driveway *before* the pickup even left for the hunting expedition. Therefore, under all analogous cases, the shooting was not an "auto accident."

[¶31.] The facts (even those established at trial) are undisputed, but some have not been mentioned by the Court. The day before this occurrence, the Petersons went to a "bale blind" they had established for deer hunting on land Brad Peterson owned in a neighboring county. This method of hunting did not involve the use of the vehicle other than a means of transportation to get to the blind. Once they arrived at the location on Friday, various members of the Peterson family hunted by standing in the blind waiting for deer to pass. On Saturday, the morning of this occurrence, some of the Petersons hunted again at the blind. They quit hunting that morning about 10:30 a.m.[5] and returned to Brad Peterson's home, where they ate, cleaned up, change clothes, and possibly took a nap. Around 2:00 or 3:00 p.m. that afternoon they decided to hunt again.

[¶32.] At the time of the occurrence that afternoon, the rifle had been in the pickup for more than a day. Four of the Petersons were sitting in the parked pickup in the driveway of Brad's home. They were waiting for Trent Peterson so they could go to Mitch Peterson's home in order to get some dry clothes (Mitch was sitting in the pickup without shoes or socks at the time the gun discharged). After going to Mitch's home, they intended to return to the bail blind to hunt. Before leaving,

---

5. Before they returned home that morning, they also "drove a tree belt" that was located about one mile from the bale blind. No other type of hunting activity was described at trial.

however, the gun accidentally discharged. At the time of the discharge, they were not loading or unloading the vehicle, the pickup was not moving, and the rifle was not jostled or moved as any occupant entered the vehicle. As they sat in the pickup waiting for Trent, Jeb Peterson noticed that the barrel of the rifle was pointed "in an unsafe position." As he attempted to reposition the gun, it discharged. Jeb testified that the only reason he attempted to reposition the gun was because of its position: it was pointing towards Mitch's legs. Under these circumstances, where the vehicle was not actually on the hunting expedition and was the mere situs of the occurrence, virtually all cases hold that the causal connection between the vehicle's "use" and the injury-producing event is insufficient for this occurrence to be considered an "auto accident."

[¶33.] Today's Court engages in causation analysis under the "use" clause,[6] but "stretch[es] far to find the requisite causal connection." Brenner v. Aetna Ins. Co., 8 ArizCtApp 272, 276, 445 P2d 474, 478 (1968). As *Brenner* noted:

---

6.  I decline to join the Court's incorporation of use clause language into the "auto accident" provision of this policy through the policy's definition of an "insured." *See supra* ¶12. As a Washington Court of Appeals noted:

> [The injured party] argues . . . that the policy definition of "injured person" gives a broader meaning to the term "automobile accident" and, thus, brings him, by implication, within the personal injury protection of the policy. An "injured person" is defined in the policy as "an insured person who is injured by accident while occupying or being struck by an automobile." This language, however, does not broaden the scope of coverage defined in the policy . . . which provides:

> We will provide the benefits described below for injury to each *insured person* caused by an *automobile accident.*

(continued . . .)

> From the standpoint of causation, this injury could have occurred in the woods, in a hunting lodge, or in a house. That the situs of the accident was in fact within a motor vehicle and the fact that both the tort-feasor and the injured party were 'using' the car at the time does not make the injury one 'arising out of the . . . use' of the vehicle. Nor did the injury result from any incident of 'ownership' of the vehicle.

*Id.* Simply stated, a reasonable and ordinary person would not consider this occurrence to have been caused by the use of an automobile, and certainly would not consider this an "auto accident."

[¶34.]     Although the facts in the cases are varied driving different results, the rule of law governing the accidental discharge of firearms in motor vehicles is remarkably consistent. Virtually all courts apply a causal connection requirement in interpreting automobile insurance "use" clauses: a requirement that the shooting arise out of the ownership, maintenance or use of the automobile. In defining that causal connection requirement, most courts recognize that the use of a vehicle for

───────────────

(. . . continued)

Farmers Ins. Co. of Washington v. Grelis, 43 WashCtApp 475, 478-79, 718 P2d 812, 813 (1986). Similarly, the definition of an "insured" under the Milbank policy does not purport to broaden the scope of coverage for "auto accidents."

Nevertheless, I agree with the Court's alternative reason for incorporation of the use clause in this case. Use clause language ("ownership, maintenance or use") is incorporated in all South Dakota auto policies under SDCL 32-35-70 (requiring insurance "against loss from the liability imposed by law for damages arising out of the ownership, maintenance, or use of the vehicle[.]") *See also* State Farm Mut. Auto. Ins. Co. v. Centennial Ins. Co., 14 WashCtApp 541, 542-43, 543 P2d 645, 646 (1975) (concluding that statute requiring coverage for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury sustained by any person 'arising out of the ownership, maintenance or use, . . .' including the loading and unloading of any insured vehicle" . . . effectively mandates that motor vehicle liability policies contain the quoted phrase).

hunting is foreseeable, and that the transportation of firearms may be incident to use of a vehicle if the vehicle is being used *on* a hunting expedition. Therefore, the cases require that *at the time of the injury* there must be a connection to the "inherent use of the vehicle" and that the act must be "incident to the use of the vehicle." *See supra* ¶21. A sufficient causal connection exists only when there is "foreseeable and reasonable *use* of the vehicle *for hunting*." *See supra* ¶22 (citing Garrison v. State Farm Mut. Auto Ins. Co., 907 P2d 891, 895 (Kan 1995) (emphasis added)).[7]

[¶35.] In this case, that causal connection was not established. The undisputed facts, as previously mentioned, reflect that at the time of the occurrence the vehicle was still parked in the driveway of Brad's home. Moreover, the stipulation of the parties and the record reflect that Peterson family members had

---

7. The Minnesota Supreme Court adopted a consistent, but more comprehensive causal connection test:

> In general terms, it has been established that such relationship need not be a proximate cause in the strict legal sense. Rather, it is sufficient to establish that the injury or loss 'was a natural and reasonable incident or consequence of the use of the (insured) vehicle.' It has been said that the causal connection must be 'reasonably apparent,' and that 'the mere fact that the use of the vehicle preceded the harm which was later sustained is not sufficient to bring such harm within the coverage of the policy.' It has also been held that the policy term 'arising out of' means 'originating from,' or 'having its origin in,' 'growing out of,' or 'flowing from.'

National Family Ins. Co. v. Boyer, 269 NW2d 10, 15 (Minn 1978) (citing Assoc. Ind. Dealers v. Mut. Serv. Ins., 304 Minn 179, 181, 229 NW2d 516, 518 (1975)).

been engaged in at least two separate hunts, and were only intending to engage in a third. The parties' stipulation states:

> *Various* members of the Peterson family *had been* hunting the previous day on November 23, 2001. *Some* of those same members of the Peterson family *also hunted* in the morning of November 24, 2001, *prior* to the shooting incident involving Mitchell Peterson.

Stipulation of Facts ¶21 (emphasis added). The record explains that during the first hunt on Friday, November 23, 2001, Brad took his sons Shane and Jeb. Later, hunting in the afternoon, they met Leland Menske. Leland drove separately, and "he was in the bales stand with us." Brad, Shane, and Jeb then drove home that night together.

[¶36.]        Early Saturday morning, Brad left with Shane to pick up Mitch at a separate residence. On this second hunt, Brad, Shane, and Mitch hunted together. Jeb went hunting with Leland in Leland's vehicle, and the parties later joined together. They quit hunting around 10 or 10:30 in the morning and returned to Brad's home. Thus, notwithstanding the Court's contrary appellate findings, these parties *stipulated* that *at the time the rifle discharged,* the morning hunt had concluded, the Petersons had retired to their home, the pickup was parked in the driveway of their home and was not moving. Although the Petersons intended to hunt at the bale blind again that afternoon, they had not left to begin hunting. Under these facts, every similar case has concluded that the accident was not causally connected to the use of the vehicle. The courts have uniformly held that such vehicles were the mere situs where an accidental discharge of a firearm occurred.

[¶37.]     The Missouri Court of Appeals has catalogued the cases involving the discharge of firearms in motor vehicles. *See* Cameron Mut. Ins. Co. v. Ward, 599 SW2d 13 (MoCtApp 1980). The facts of today's case fall within the first category of cases involving "the accidental discharge of guns inside moving or motionless vehicles while an occupant of the vehicle is handling or toying with the gun." *Cameron*, 599 SW2d at 15. As *Cameron* observed, "[w]ithout exception, these cases hold that no coverage exists under the insuring agreements of the respective automobile liability policies involved because there was no causal connection between the discharge of the guns and the use of the vehicles . . . ." *Id.* Rather, "at best, the vehicles were merely the 'situs' or 'locus' of any resultant injuries as discharge of the guns was unconnected with the inherent use of the vehicles." *Id.*

[¶38.]     Those cases, involving both hunting and non-hunting handling of firearms inside a vehicle, find no causal relationship under the facts we consider today. *See* Western Cas. & Sur. Co. v. Branon, 463 FSupp 1208, 1211 (EDIll 1979) (holding accidental discharge of firearm in moving motor vehicle did not implicate a sufficient causal connection to fall within the automobile use clause: "[A] fortuitous accidental shooting does not, merely because it takes place in a car, arise out of the use of the automobile."); Am. Liberty Ins. Co. v. Soules, 288 Ala 163, 168, 258 So2d 872, 876 (1972) (holding that injuries sustained when pistol discharged as occupant pushed pistol down the back of the seat, at time automobile was parked, was not causally connected with use of the automobile: "[O]ccupant of an automobile injured by discharge of a firearm by another occupant [does not] constitute an injury arising out of the use of the insured automobile, for the reason that there is no

causal relation between the use of the automobile and the injury."); Hartford Fire Ins. Co. v. State Farm Mut. Auto., 574 SW2d 265 (Ark 1978) (holding accidental discharge of firearm inside vehicle does not fall within the use clause); Azar v. Employers Cas. Co., 178 Colo 58, 61, 495 P2d 554, 555 (1972) (holding that even while engaged in a hunting enterprise, accidental discharge of firearm inside stopped vehicle does not fall within the causal connection requirement of the use clause: "[I]t cannot reasonably be said that the discharge of the weapon in this case originated from, grew out of or flowed from the use of the vehicle. Rather, the injury originated from, grew out of or flowed from the use of the firearm."); Mason v. Celina Mut. Ins. Co., 161 Colo 442, 423 P2d 24 (1967) (holding that even when returning from pistol target practice, an accidental discharge in vehicle that was parked until one of the occupants returned did not implicate the causal connection required to fall within the use clause) (citing 7 APPLEMAN, INSURANCE LAW AND PRACTICE § 4317, at 144, 146, for the proposition that the accident must have arisen "out of the inherent nature of the automobile . . . in order to bring one within the terms of such a policy."); U.S. Fid. & Guar. Co. v. W. Fire Ins. Co., 450 SW2d 491 (KyCtApp 1970) (holding accidental discharge of gun when occupant began to load the gun was not sufficiently connected to the automobile to be considered to have been a use within the contemplation of the parties to the automobile insurance contract); Nat'l Family Ins. Co. v. Boyer, 269 NW2d 10, 15 (Minn 1978) (holding no relationship between the use of gun and the use of the parked automobile; the automobile was the mere situs of the injury); Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Bruecks, 179 Neb 642, 139 NW2d 821 (1966) (holding that even

broadly construing the use clause, a gun discharge while a hunter was unloading it inside of his vehicle was not covered because the vehicle was merely the situs of the accident; the accident did not arise out of the use of the vehicle); Raines v. St. Paul Fire & Marine Ins. Co., 9 NCApp 27, 175 SE2d 299 (1970) (holding no coverage under the use clause for accidental discharge of firearm in parked vehicle because there was no causal connection between the discharge of the pistol and the "ownership, maintenance or use" of the parked automobile); and State Farm Mut. Auto Ins. Co. v. Centennial Ins. Co., 14 WashApp 541, 543 P2d 645 (1975) (holding no coverage under use clause in which occupant unloaded a rifle in the vehicle causing the accidental discharge while returning from a hunting excursion).

[¶39.]     The Court declines to discuss or distinguish these authorities. Instead, the Court labels and adopts the circuit court's conclusions of law as "logical conclusion[s]," that this shooting "happened *on* a hunting expedition," that the "*movement* [of the gun was] part of the use of the vehicle *in the hunting expedition*," and therefore the pickup "*was* being used in a hunting expedition." *Supra* ¶25 (emphasis added). These are appellate findings, and even if they were conclusions of law, they are entitled to no deference. Marschke v. Wratislaw, 2007 SD 125, ¶8, 743 NW2d 402, 405 (additional citations omitted). No deference is especially appropriate here because none of the historical facts established at trial are in dispute. Under those circumstances, our task is a mixed question of fact and law: i.e., whether the historical facts of this incident constitute an "auto accident," a question we review de novo. *See In re* Dorsey & Whitney Trust Co., LLC, 2001 SD 35, ¶6, 623 NW2d 468, 471.

[¶40.]    More importantly, this Court's appellate findings are untethered to the *use* of the vehicle *at the time of the shooting*, and are in conflict with the parties' stipulation of facts and the record upon which this case was presented. For example, the Court indicates "the afternoon hunt was a continuation of the morning hunting expedition," suggesting that the Petersons "[t]emporarily stopp[ed] the vehicle for a brief snack break[.]" *Supra* ¶25. Similarly, the Court finds coverage because this vehicle was actually "*being used* to *transport* deer hunters *to the field[.]*" *Supra* ¶26.

[¶41.]    Contrary to this Court's findings, the stipulation specifically reflects that rather than being on the hunting expedition at the time of the occurrence, the shooting happened at a time when: "various members of the Peterson family were preparing to return to their hunting activities," Stipulation of Facts, No. 22, the pickup "was not moving, was not in gear, but the engine was running," *id*. No.19, and the four occupants were all seated in the pickup *in the driveway of their home* "waiting for Trent so they *could* leave *to go hunting*." *Id*. No.19 (emphasis added). Considering these stipulated and undisputed facts, the Court mistakenly premises its holding on findings that at the time of the shooting "the vehicle *was being used to transport deer hunters to* the field," and the pickup "*was being used* in a hunting expedition where guns *are being transported[.]*" *See supra* ¶26 (emphasis added).

[¶42.]    Most importantly, even if the Court were correct that Petersons intended to engage in a "continuation" of the morning hunt, the Court fails to consider two intervening events. First, there is no dispute that Petersons ceased hunting to rest and eat lunch, and that they had not left their home to return to the

bale blind when the gun discharged. Second, there is no dispute that at the time of the discharge, they were going to go to Mitch Peterson's home to get dry clothing before they were going to return to the bale blind to hunt. These types of intervening events must be considered in the causation analysis in such cases. *See* Norgaard v. Nodak Mut. Ins. Co., 201 NW2d 871, 875 (ND 1972) (concluding that even while *on* a hunting expedition, use of a vehicle as a "gun rest" to shoot a firearm did not provide a sufficient causal connection between the vehicle in the accident under the use clause). The North Dakota Supreme Court noted, "the causal relationship need not constitute a proximate cause, but on the other hand if an injury is directly caused by some independent or intervening cause it does not arise out of the use of an automobile, notwithstanding there may have been some remote connection between the use of an automobile and the injury complained of." *Id*.

[¶43.]    The Court also fails to apply our own precedent recognizing the difference between being "on a hunting expedition" and "future hunting." Lyndoe v. Am. Standard Ins. Co. of Wisconsin, 90 SD 644, 650, 245 NW2d 273, 276 (1976). Thus, "the proper inquiry in hunting accidents involving automobiles [requires an examination of] the use made of the vehicle *at the time of the accident[.]*" Sanchez v. Herrera, 109 NM 155, 157, 783 P2d 465, 467 (emphasis added). When that timing examination is made, the Court's own authorities do not support a causally related use of the vehicle in this case.

[¶44.]    For example, although the Court relies on *Garrison,* that case involved the following disparate facts:

> After several stops [the occupants of the vehicle] saw some birds and decided that Pfannenstiel would get out of the car and Garrison would then drive on to the far end of a line of trees and hunt there. Garrison slowed the car; as it approached or came to a stop and Pfannenstiel was getting out of the car, Pfannenstiel's shotgun discharged, striking Garrison in the leg and causing a significant injury.

258 Kan at 549, 907 P2d at 893. The Kansas Supreme Court thereafter highlighted that different factual scenario in which a causally related use occurs because the vehicle is actually involved in the hunt:

> The injury occurred while the car was being used to transport dove hunters during a hunting trip. Garrison was driving. The engine was running. Garrison stopped the car while Pfannenstiel tried to exit with his shotgun to hunt doves. The shotgun discharged while Pfannenstiel was removing it from the car. Garrison had intended to drive further after Pfannenstiel was out of the car. The car was "involved," in that the injury occurred while Pfannenstiel was removing his shotgun from the car and Garrison was driving the car.

*Id*. at 554, 907 P2d at 896. Thus, unlike today's case, where the Petersons were still sitting in their driveway only intending to engage in hunting at a distant location, the parties in *Garrison* were actually "transport[ing] guns during a hunting trip." *Id*. at 555, 907 P2d at 896.

[¶45.] Similarly, the Court's other primary authority, *Allstate Ins. Co. v. Truck Ins. Exchange*, 63 Wis2d 148, 216 NW2d 205 (1974), concerns two individuals who were actually pursuing an elk in a vehicle specially adapted for hunting purposes. When the elk was located, the driver stopped the vehicle so the passenger could remove his loaded rifle from the vehicle to shoot the elk. In attempting to remove the rifle, it discharged, causing injury. In construing an exclusion under a general liability policy and a use clause providing coverage in an auto policy, the

Wisconsin court found coverage under the auto policy because persons "*actively engaged in loading and unloading* the automobile in the commonly accepted meaning of those words are considered to be using or operating the automobile and are covered by the loading and unloading provision of the policy." *Id.* at 155, 216 NW2d at 209 (emphasis added). Peterson's occurrence is not, however, a "loading and unloading" case, nor does it involve participants "actively engaged" in the act of hunting.

[¶46.] Clearly, the Court's decision is unsupported and contrary to any authority with remotely similar facts. In light of the stipulated fact that the various members of the Peterson family were only "preparing to return to their hunting activities," and in light of the undisputed fact that they were still seated motionless in a parked vehicle in the driveway, how can the Court find coverage on contrary findings? Under the stipulated facts, the only connection between this shooting and the pickup was that the parties intended to use the pickup as transportation to go to the bale blind to hunt that afternoon. *At the time* of the occurrence, however, the Petersons had not started the afternoon hunting enterprise, and their *intended* use that afternoon cannot reasonably be construed as an "auto accident."

[¶47.] Even giving the language of the policy insuring "auto accidents" the broad interpretation as required by *Lyndoe*, *supra*, the Court has stretched that language beyond common sense and reasonable understanding. We should not construe statutes (SDCL 32-35-70) and insurance contracts in such a manner. "We will not resort to a forced construction of the language in [an insurance] contract for the purpose of either limiting or extending coverage." Gloe v. Union Ins. Co., 2005

SD 30, ¶29, 694 NW2d 252, 260. "Insurance contracts warrant reasonable interpretation, in the context of the risks insured, without stretching terminology." *Zochert v. Nat'l Farmers Union Prop. & Cas. Co.*, 1998 SD 34, ¶5, 576 NW2d 531, 532 (citing *Opperman v. Heritage Mut. Ins. Co.*, 1997 SD 85, ¶4, 566 NW2d 487, 490) (citing *State Farm Mut. Auto. Ins. Co. v. Vostad*, 520 NW2d 273, 275 (SD 1994))).

[¶48.]     Today's case is similar to an accidental stabbing that occurred in the backseat of a vehicle in Washington. As the Washington Court of Appeals observed, "the average person would not consider the stabbing incident in [the insured's] parked van as an 'automobile accident.' Rather, we believe the average person would . . . say only that [the injured party] was stabbed while sitting in his automobile." *Grelis*, 43 WashApp at 478, 718 P2d at 813. Similarly, considering the actual use of Brad's parked pickup at the time of this occurrence, the average person would not conclude that this shooting was an "auto accident." The average person would say that Mitch was shot while sitting in the backseat of a parked pickup. Because, under the stipulated and undisputed facts, this shooting did not occur incident to the vehicle's actual use in hunting, I dissent.

[¶49.]     KONENKAMP, Justice, joins this dissent.